UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                CASE NO. 19-cr-00157-01

VERSUS                                  JUDGE ELIZABETH E. FOOTE

KEATON LAMAR SHAW (01)                  MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Keaton Lamar Shaw ("Defendant") is charged with possession with intent to distribute methamphetamine, cocaine, and marijuana. Doc. 1. Defendant is also charged with being a felon in possession of a firearm and possession of a firearm in furtherance of drug trafficking. The evidence was located following a traffic stop and during the search of Defendant's girlfriend's residence. Before the court is Defendant's Motion to Suppress. Docs. 15 (motion) and 24 (supplement). For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

An evidentiary hearing was held on the motion to suppress. Five witnesses testified at the hearing: (1) Agent Timothy King, (2) Agent Daniel Albrecht, (3) Agent Earlton Parker, (4) Agent John Witham, and (5) Agent Robert Chapman. The following facts were established.

Agent King is assigned to the Shreveport Caddo Narcotics Task Force, which conducts narcotics investigations throughout the city and parish. He was assigned to an

investigation of Defendant, who was implicated in shootings in the Shreveport area. King ran a criminal history check of Defendant and found that Defendant had multiple drug arrests, battery arrests, and an arrest for second-degree murder. King began surveillance of Defendant and on several occasions followed him from a probation office to a residence at 130 East College Street in Shreveport.

On February 4, 2019, King and Agent Jackson conducted a trash pull at the residence. The trash can was in front of the house and by the curb ready for trash pickup. The address was written on the outside of the can, and no other trash cans were around it. The agents seized three trash bags from the can and took them to the police department. They found a vacuum-sealable bag that contained residue that field-tested positive for marijuana; two partially smoked suspected marijuana blunts; and discarded mail addressed to Defendant's girlfriend, Kimberly Love Ms. Richard ("Ms. Richard"), at 130 East College Street.

On February 11, 2019, King and Jackson conducted another trash pull at the residence. The trash can was by the curb ready for pickup, and the address was written on the outside of the can. The agents removed trash bags from the can, and King could smell a strong odor of marijuana coming from one of the trash bags. The agents brought the bags to the police department to search. They found two vacuum-sealable bags with residue that field-tested positive for marijuana, two bags with unknown residue, and documents addressed to Ms. Richard at 130 East College Street.

On February 27, 2019, Agent King obtained a state search warrant for the 130 East College Street residence. The application for the warrant included information about the

two trash pulls, the results of the field tests from the trash pulls, surveillance information, and the Defendant's criminal history.

Agents Albrecht, Parker, Witham, and Chapman were assigned to assist King in executing the search warrant. King briefed the other agents on Defendant's case. The briefing included Defendant's criminal history, pictures of Defendant, and a history of the investigation. The agents planned to watch the house until Defendant left, and some of the agents would conduct a traffic stop while the other agents executed the search warrant. The agents formulated this plan for officer safety and the safety of any bystanders who may be at the residence. Agent Witham explained that using a SWAT team to execute a search warrant could "push the suspect back into a corner."

Agents King and Jackson parked in a patrol car on East College Street and watched the residence. Agents Witham, Albrecht, and Parker were in another car that was out of view of the residence. After a long period of time passed with no movement coming from the house, the officers began to think the house was empty. An animal control patrol drove by, and one of the agents suggested having the animal control officer knock on the door of the residence and pretend to be looking for a stray dog. The agents provided an animal control officer with a picture of Defendant, and the officer knocked on the door to the residence. Moments later, the officer came back and told the agents that the man in the picture had answered the door of the residence.

A short time later, a City of Shreveport Water & Sewerage truck pulled up to the residence. Defendant exited the residence and got into the passenger seat of the truck. The

truck, with Defendant inside, left the residence.  King told Witham via radio that Defendant was in the truck.

Witham drove his patrol car in the direction of the truck.  He approached an intersection as the truck approached a stop sign.  Witham noticed that the truck had an expired inspection sticker.  Govt. Ex. 4 (photo of inspection sticker).  Agent Albrecht saw the truck "slow roll" through the stop sign.  Witham activated his lights and siren to conduct a traffic stop of the truck.  The truck continued for a short time and then made a left turn.  It continued for another two blocks and turned southbound onto Holly Lane.  After another 200 yards, the truck finally came to a stop.[1]

The agents exited the patrol car and approached the truck.  Albrecht and Parker noticed that Defendant was "moving around a lot." Defendant appeared to be trying to conceal something between the driver and himself.

Witham approached the driver's side of the truck, and Albrecht and Parker approached the passenger's side.  Witham told the driver to roll down his window.  Witham could smell a strong odor of marijuana from the open window.  When the driver rolled down the window, Witham saw a handgun stuffed between the console and the left side of the passenger's seat occupied by Defendant.  The barrel was pointed down, and Witham could clearly see the handle pointing toward the dash.[2]  Govt. Ex. 3 (photo of gun between

---

[1] There is no video recording of the traffic stop.  The street level narcotics unit did not have dash or body cams available for their agents.  Tr. 30.

[2] The agents' testimony differed on this point.  Albrecht testified that Witham said something about the gun before Defendant opened the passenger door.  However, Witham and Parker testified that

the passenger seat and console).  Witham told the driver to exit the truck, and Witham advised Parker and Albrecht to have Defendant exit the truck as well.

Albrecht and Parker told Defendant to get out of the truck.  Defendant opened the door, and Albrecht could smell the odor of marijuana coming from inside the truck.

Albrecht and Parker grabbed Defendant and pulled him out of the truck.[3]  Defendant resisted and began reaching toward his waistband area, so Albrecht and Parker took him to the ground and handcuffed him.  Albrecht could smell the odor of marijuana on Defendant.

Albrecht noticed that Defendant was wearing a backpack on his right arm.  The backpack was within reach of Defendant's hands.  Witham, who had been securing the driver as the other two agents were handcuffing Defendant, came over with a pocketknife, cut the strap of the backpack, and pulled it away from Defendant.

Witham smelled marijuana on the backpack[4], but it was locked and Witham could not open it.  While Defendant was still on the ground next to him, Witham used his knife to make a small hole in the top of the backpack.  He saw what he suspected was marijuana inside the bag.  Witham then took the backpack to his car and cut it open further.  Inside

---

Witham did not say anything about the gun until after Defendant was handcuffed.  Albrecht did not see the gun until after Defendant was handcuffed.

[3] Albrecht testified that Defendant opened the door himself; Parker testified that the agents had to open the door.

[4] Defendant argues that the agents could not have smelled marijuana on the backpack because it was a "skunk bag" that is specially designed to mask odors of things inside of the backpack.  See Defense Ex. D-2 (photos and tags of an exemplar bag).  However, Agent Witham testified that if the bag was around marijuana, then the outside of the bag would still smell like marijuana.  In any event, the agents could not have known whether the odor was inside the bag or merely on the surface of the bag.  Tr. 40.

the backpack were 226.4 grams of marijuana, 6.1044 grams of powder cocaine, 4.4504 grams of crystalline methamphetamine, and 3017 tablets containing a mixture of methamphetamine.

Albrecht advised Defendant of his Miranda rights.  Defendant indicated that he understood but did not answer questions at that time.  Meanwhile, Witham searched the truck.  He recovered the gun, which had been reported stolen, that was loaded with 21 rounds of ammunition.  Witham also found about an ounce of marijuana hidden in a box of rags.

After the traffic stop was initiated, King and Jackson went to the front door of the residence.  After knocking a few times, they entered the residence and announced that they were law enforcement conducting a search warrant.   Ms. Richard, Defendant's girlfriend, came from the back of the house, and the agents brought her into the living room while they searched the house.

The agents found in the master bedroom 17 grams of marijuana, a .40 caliber drum magazine with 36 live rounds inside, a pistol magazine, a gram of crushed methamphetamine pills, package material, and a thousand dollars in cash.  They found a gram of marijuana in another bedroom.

Witham brought Defendant to the residence while the agents were still searching the home.  King and Albrecht spoke to Defendant in the master bedroom.  King advised Defendant of his Miranda rights again, and Defendant stated that he understood and was willing to speak to King.

King asked Defendant about the narcotics that were found in his backpack. Defendant said that he received the narcotics from a friend. Defendant said that the drugs had come from a bigger shipment of narcotics.

King asked Defendant about the gun that was found in the truck. Defendant told King he bought the gun for protection because he had recently been shot four times. Defendant acknowledged that the gun was likely stolen before he bought it. Defendant said that he bought the drum magazine that was found in the master bedroom at a gun show to use with the gun. Defendant said he knew he was a convicted felon and was not allowed to possess a firearm. He also admitted that all of the drugs found in the house belonged to him.

On March 1, 2019, Agent Chapman and Agent Rick Anderson interviewed Defendant at the Caddo Correctional Center. The interview took place in an interview room in an administrative portion of the jail. Chapman advised Defendant of his Miranda rights, and Defendant said that he understood. Defendant agreed to speak with the agents, and their conversation was recorded. Defendant told the agents where he received the drugs. His statement was similar to the one he gave Agent King at the house.

The evidence obtained in the trash pulls that field-tested positive for marijuana were sent to the North Louisiana Crime Lab on March 4, 2019. The evidence found in the February 4 trash pull tested positive for marijuana, but marijuana was not detected in the vacuum-sealable bags found in the February 11 trash pull.

**Credibility Assessment**

As Defendant points out, there are some minor inconsistencies in the agents' testimonies.  For example, Witham said he mentioned the gun only after Defendant was handcuffed, but Albrecht remembers Witham pointing out the gun before the arrest.  Other inconsistencies include where in the patrol cars each agent was seated, the amount of marijuana inside the truck, and who opened Defendant's car door.  However, minor inconsistencies are to be expected when the events unfolded very quickly and the witness testified about them months later.  On the whole, the agents' testimonies were consistent with regard to the major details of the incident, and the undersigned finds them to be credible witnesses.

**Law and Analysis**

**A.  Electronic Search Warrant**

The search warrant application for Ms. Richard's residence was submitted by Agent King electronically using a computer program known as "Warrant Now."  Tr. 165.  Once a warrant application is completed using that program, the applying officer clicks a button indicating that he or she swears the information in the warrant is true and correct.  Tr. 166-167.  The warrant application is then submitted (electronically) to the District Attorney's office who must approve it.  If the DA approves the application, it is sent (electronically) to the state court judge on duty.

Defendant argues that the warrant was invalid because it was not clear on the face of the warrant that it was signed electronically.  The Fourth Amendment requires that a warrant be issued on probable cause, be supported by an oath or affirmation, describe with

particularity the place to be searched, and describe with particularity the persons or things to be seized. <u>Groh v. Ramirez</u>, 540 U.S. 551, 557 (2004).

There is no specific requirement on how the oath or affirmation is communicated, whether in person, by telephone, or electronically. <u>See</u> <u>id</u>; <u>United States v. Demouchet</u>, 2016 WL 7331562 (M.D. La. 2016). The oath or affirmation element requires that a person "manifests an intention to be under oath," which is satisfied when an officer "sign[s] the affidavit and application for a warrant" that bears language that is "designed to ensure that the truth will be told by insuring that the witness or affiant will be impressed with the solemnity and importance of his words." <u>Demouchet</u>, 2016 WL 7331562 at*6. This can include language that an affiant is "duly sworn" and that the "facts [in the affidavit] are true to the best of [the affiant's] knowledge." <u>Demouchet</u>, 2016 WL 7331562 at *6.

The first paragraph of the warrant application states: "PERSONALLY CAME AND APPEARED BEFORE ME, THE UNDERSIGNED Authority. . . Timothy King. . . who, upon being duly sworn by me, deposes and says:". Defendant argues that this line is false and misleading because King did not personally appear and was not sworn. Defendant also argues that King did not strictly comply with Louisiana state law governing electronic warrants, which requires the affiant to list his telephone and electronic address in the affidavit. Defendant argues that there was no record of telephonic communication between King and the judge to ensure the authenticity of King's digital signature.[5] Defendant also

---

[5] Defendant claims that such telephonic communication is required by La. C. Cr. P. art. 162.2(G). That article provides that telephonic communication satisfies the requirement of La. R.S. 9:2603.1(D), which states: "Any application used to attach a digital signature to any warrant or affidavit must have security procedures in place that insure the authenticity of the digital

points out that King did not put his badge number next to his signature, as he did on prior affidavits.

The exclusionary rule requires that evidence obtained in violation of the Fourth Amendment should be suppressed. "The exclusionary rule was created to discourage violations of the Fourth Amendment, not violations of state law." United States v. Walker, 960 F.2d 409, 415 (5th Cir. 1992). Accordingly, the proper inquiry is whether the search warrant and affidavit met the requirements of the Fourth Amendment. Id. Technical violations of state law do not invalidate the warrant. Id; United States v. Cordero, 465 F.3d 626, 630 (5th Cir. 2006). Therefore, Defendant's arguments that the warrant did not strictly comply with state law are not sufficient to invalidate the warrant.

The court finds that the warrant met the constitutional requirements of the Fourth Amendment. King testified at the hearing that when he electronically sends a warrant to the judge, "there is a statement indicating on there before you send it that says I swear to be true and correct, and then you hit 'okay' and it sends it." Tr. 167. By doing so, King clearly expressed his intention to be under oath. The court finds that this satisfies the oath required by the constitution. See Demouchet, 2016 WL 7331562 at *6. The warrant was signed by an impartial judge, and it contained specific descriptions of the residence to be

---

signature." While art. 162.2(G) states that a telephone call shall serve as a sufficient security measure, it does not say that a telephone call is the only appropriate security measure. Login passwords could also serve as a security measure. Agent King used his own unique login information to ensure the authenticity of his signature on the affidavit. Tr. 167.

searched and the items to be seized. Accordingly, the court finds that the warrant met all of the constitutional requirements of the Fourth Amendment.

### B. Validity of the Search Warrant

#### 1. Probable Cause

Defendant argues that the evidence seized from his residence pursuant to the search warrant should be suppressed because the warrant is not supported by probable cause. Defendant also argues that the affidavit in support of the warrant contained false, unreliable, and stale information, or information that was submitted to the judge with reckless disregard for the truth. [6]

Under the Fourth Amendment, "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "[T]he Fourth Amendment require[s] that (1) a warrant provide sufficient notice of what the agents may seize and (2) probable cause exist to justify listing those items as potential evidence subject to seizure." United States v. Sanjar, 853 F.3d 190, 200 (5th Cir. 2017).

The affidavit in this case provides probable cause to search Defendant's residence for evidence of illegal drug trafficking. The information from the affidavit is briefly summarized below:

---

[6] Defendant also argued that the warrant was issued on unlawful surveillance because officers conducted a trash pull on February 9, 2019, which was not a regular trash day. Defendant argued that the agents "must have gone onto the property, without a warrant, to do a trash pull, which is unlawful." The Government points out that the February 9 date was a typographical error that was included in a warrant that was never executed. Doc. 38. The actual trash pull was conducted on February 11, 2019, a regular trash day, and was, therefore, lawful.

Para. 3-4:    On February 4, 2019, Agents Jackson and King conducted a trash pull at the residence. The trash can they searched was marked with the house number of the residence.

Para. 5:    In the trash bags pulled from the can, the agents found two suspected blunts, which field tested positive for marijuana.

Para. 5:    They also found a vacuum-sealable bag capable of containing 1-2 pounds of marijuana. Residue from the bag field-tested positive for marijuana.

Para. 6:    Also inside the trash bags were documents of residency for Kimberly Love Ms. Richard, who lives at the residence.

Para. 6:    Ms. Richard has been arrested many times in the past for possession of marijuana, illegal use of a controlled drug in the presence of a person under 17, unlawful possession of a Schedule I CDS without prescription.

Para. 6:    Defendant was seen frequenting the residence "often and on multiple occasions." Defendant has a criminal history that includes possession of marijuana, two counts of manufacturing and distribution of Schedule I CDS, possession with intent to distribute Schedule II CDS, numerous charges of resisting an officer, possession of a firearm by a convicted felon, and second-degree murder.

Para. 7-8:    One February 11, 2019, Agents Jackson and King conducted a second trash pull at the residence. The trash can they searched was marked with the house number of the residence.

Para. 9:    Inside the trash bags were two large vacuum-sealable bags that emitted an odor of marijuana. The residue inside the bags field-tested positive for THC. The bags appeared to be capable of containing approximately 2-3 pounds of marijuana each.

Para. 9:    Also inside one of the trash bags was a document of residency addressed to Ms. Richard.

Para. 10:    During surveillance of the residence, agents noted a history of traffic arriving at and leaving the residence. "Different vehicles have been seen at the residence and then later the vehicles will be gone."

Para. 10:  One instance included an incident witnessed by agents in which an unidentified male walked into the yard of the residence. Defendant came out of the house, greeted the unidentified male, then entered the residence. The two remained in the house for a brief amount of time before exiting the residence.

Defendant cites United States v. Lyles, 910 F.3d 787 (4th Cir. 2018), in which a state search warrant was invalidated because the only probable cause alleged in the affidavit was a single trash pull that yielded three marijuana stems and empty packs of rolling papers. Defendant argues that in this case, as in Lyles, agents found only a small amount of marijuana in two trash pulls and that officers "have to find more than small amount of marijuana to justify the search of someone's residence."

However, the agents found more than just small amounts of marijuana. They found vacuum-sealable bags that were capable of carrying up to three pounds of marijuana. The residue in those bags field-tested positive for marijuana. Defendant and Ms. Richard, who lived at the residence, both have criminal histories involving narcotics. Defendant has several arrests for possessing, manufacturing, and distributing drugs. The affidavit also showed that officers saw a history of unusual traffic to and from the residence.

Defendant points out that the affidavit does not include details such as times, dates, and facts, of any surveillance. But even without those details, the information contained in the affidavit was enough to establish a fair probability that illegal drugs were stored at and distributed from the residence.

Defendant argues that the information in the warrant was stale because the warrant was signed and executed 16 days after the last trash pull. Stale information cannot be used to establish probable cause for a search warrant. United States v. Robinson, 741 F.3d 588,

596 (5th Cir. 2014). Whether information is stale turns on the "particular facts of the case, including the nature of the unlawful activity and of the evidence sought. . . ." Id. "[W]hen the information of the affidavit clearly shows a long-standing, ongoing pattern of criminal activity, even if fairly long periods of time have lapsed between the information and the issuance of the warrant, the information need not be regarded as stale. United States v. Webster, 734 F.2d 1048, 1056 (5th Cir. 1984).

The affidavit in this case alleged probable cause that there was ongoing, continuous drug activity at the residence. The vacuum-sealable bags found in the trash pulls were capable of containing large amounts of marijuana and field tested positive for THC. Defendant has a history of distributing drugs. There was unusual traffic to and from the house. Taken together, this evidence shows a probable pattern of illegal drug trafficking activity. The court finds that the information in the affidavit was not stale given the particular facts of this case pertaining to an ongoing trafficking operation. Accordingly, the affidavit provided probable cause for the issuance of the search warrant.

### 2. Good Faith Exception

Even if the affidavit fell short of establishing probable cause, Agent King acted in objective good faith in relying on the warrant. Even where the Fourth Amendment has been violated, that "does not necessarily mean that the exclusionary rule applies." Herring v. United States, 55 U.S. 135, 140 (2009). Where, as here, agents execute a search pursuant to a warrant, the exclusionary rule does not apply so long as the police conducted the search in an "objectively reasonable reliance" on the warrant. United States v. Leon, 468 U.S. 897, 922 (1984).

However, the good faith exception cannot apply if one of four circumstances is present: (1) If the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid. U.S. v. Stalnaker, 571 F.3d 428, 435 -436 (5th Cir. 2009).

Defendant argues that the good faith exception does not apply because the affidavit included a false statement regarding the samples seized in the second trash pull. Defendant argues that the statement in the affidavit regarding the field test may have been true, but the lab results showed that no marijuana was actually found. Defendant says the following factors support his contention that this was a "falsehood" made intentionally or with reckless disregard for the truth: (1) the affidavit was prepared before King received the crime lab report; (2) the positive field test was not reliable, and King did not take a photo of the test results or preserve the test kit to corroborate his testimony that the result was positive; (3) King failed to inform the judge in the February 27 affidavit that he had previously secured two warrants on the same set of facts but did not execute them; and (4) it was not clear on the face of the affidavit that it was signed electronically.

The court finds that Agent King's reliance on the warrant issued here was objectively reasonable. King did not include any false statements regarding the crime lab

testing in the affidavit.  In fact, the materials had not even been sent to the crime lab at that point.  King would not have known how long it would take to get the results, so he was not unreasonable for not waiting for the results before seeking a search warrant.  The marijuana had already field-tested positive and, although that result was later discovered to be inaccurate, King did not act in bad faith by relying on it.  King had no reason to believe that the residue would later turn out to be negative because, in addition to the field test, he also was able "clearly smell [the odor of marijuana] through the trash bags."  Tr. 142.

King's failure to inform the judge in writing that this was the third warrant on this set of facts also does not indicate that he acted in bad faith.  Judge Waddell-Garret signed all three warrants.  Presumably, she already knew that King had secured the warrants but did not execute them for some reason.

The court finds that the language in Warrants Now indicating that King personally appeared before the judge was not a falsehood made intentionally or with reckless disregard for the truth but was mistakenly included.  Nothing in the affidavit or in Agent King's testimony indicates that he intended to be mislead anyone regarding the means in which the warrant was transmitted to the judge.  The judge knew when she signed the warrant that it was transmitted electronically rather than in person.

Accordingly, the court finds that no circumstances are present in this case that would bar the application of the good-faith exception.  The agents in this case reasonably relied in good faith on the warrant to authorize the search of the residence.

### C. Validity of the Traffic Stop

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)." <u>United States v. Rosales-Giron</u>, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting <u>United States v. Stevens</u>, 487 F.3d 232, 244 (5th Cir. 2007). "Under <u>Terry</u>, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." <u>Id</u>.

For a traffic stop to be justified at its inception, an officer need only have reasonable suspicion that "some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." <u>United States v. Lopez-Moreno</u>, 420 F.3d 420, 430 (5th Cir. 2005). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996). Lawful cause to make a traffic stop exists when a defendant commits a traffic violation and a law enforcement officer observes the violation. <u>United States v. Khanalizadeh</u>, 493 F.3d 479, 482 (5th Cir. 2007).

"The rule established by the Supreme Court in <u>Whren</u> allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." <u>United States v. Cole</u>, 444 F.3d 688, 689 (5th Cir. 2006). The legal justification for the traffic stop must simply be "objectively grounded." <u>Id</u>.

Defendant does not challenge the second <u>Terry</u> prong, so the court will address only the first prong of the analysis—whether stopping the vehicle was justified at its inception. The court finds that the traffic stop was justified because two agents observed two separate traffic violations: the expired inspection sticker on the vehicle and the failure to come to a complete stop at a stop sign.

Agent Witham testified that when he first saw the truck, he noticed that the background of the inspection sticker was yellow.  Tr. 46.  Based on his experience as a patrol officer, he knew that a yellow inspection sticker would have expired in 2018 and that inspection stickers for 2019 had a maroon background.  Tr. 45-46.  Accordingly, even without seeing the specific date on the inspection sticker, Agent Witham knew that it had expired.  Tr. 46.  Failing to maintain a current inspection sticker is a violation of La. Rev. Stat. Ann. 32:53.  Additionally, Agent Albrecht saw the truck fail to stop completely, and he told Witham that the truck "just rolled the stop sign."  Tr. 96.  Therefore, Agent Witham had ample reasonable suspicion to conduct the traffic stop.

### D. Search of the Vehicle

#### 1. Standing

The Government argues that Defendant lacks standing to challenge the search of the city truck in which he was a passenger.  The Fifth Circuit has recognized that passengers who assert neither a property nor a possessory interest in the automobile that was searched have no legitimate expectation of privacy entitling them to the protection of the Fourth Amendment.  <u>United States v. Iraheta</u>, 764 F.3d 455, 461 (5th Cir. 2014); <u>United States v. Greer</u>, 939 F.2d 1076, 1093 (5th Cir.1991).

Defendant states that, under Louisiana law, a defendant who is adversely affected by a search has standing to challenge the search.  La. Const. Art. I, Sec. 5; State v. Stephens, 917 So.2d 667 (La. App. 2d Cir. 2005).  He argues, without citing any authority, that this court should apply Louisiana state law to the standing issue because state law enforcement agents conducted the search.

"The exclusionary rule was created to discourage violations of the Fourth Amendment, not violations of state law."  United States v. Walker, 960 F.2d 409, 415 (5th Cir.1992).  "The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution."  Id.; see also Cordero, 465 F.3d at 630.

Even if state law enforcement officers run afoul of a state law that would require suppression in state court, the evidence should not be suppressed in a federal court prosecution unless the officers violated the Fourth Amendment.  United States v. Becerra-Garcia, 397 F.3d 1167 (9th Cir. 2005) (stop of vehicle by tribal rangers on Indian reservation not allowed under tribal law but was irrelevant to Fourth Amendment issue in federal court prosecution; tribal law treated like state law); and United States v. Vite-Espinoza, 342 F.3d 462, 465 (6th Cir. 2003) (state officer impounded truck and took inventory that found evidence; state law required suppression but search did not violate Fourth Amendment, so evidence was admissible in federal case).

The court finds that, as a passenger in the truck (which was clearly owned by the city and was being driven by a city employee), Defendant lacks Fourth Amendment standing to challenge the search of the truck. Any state law violation to the contrary is inapplicable.

## 2. Probable Cause

Even if Defendant has standing, the search was justified by probable cause. Agent Witham testified that when the driver of the truck rolled down his window, Witham smelled the odor of marijuana inside the vehicle. Tr. 22. Agent Albrecht also smelled a strong odor of marijuana when the passenger's side door was opened. Tr. 84. The Fifth Circuit has repeatedly held that the smell of the marijuana gives rise to probable cause to search a vehicle for drugs. See, e.g., United States v. Lork, 132 Fed. Appx. 34 (5th Cir. 2005) (detectable odor of marijuana emanating from a vehicle provides probable cause for the search of the vehicle); United States v. McSween, 53 F.3d 684, 686-687 (5th Cir. 1995) (the smell of marijuana alone may be enough for a finding of probable cause); United States v. Reed, 882 F.2d 147, 149 (5th Cir. 1989) (the officer's detection of marijuana "in itself. . .justified the subsequent search of [the defendant's] vehicle"); United States v. Henke, 775 F.2d 641, 645 (5th Cir. 1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."). Accordingly, the court finds that the agents had probable cause to search the truck.

## E. Arrest of Defendant

Defendant argues that the agents did not have probable cause to arrest Defendant without an arrest warrant. Law enforcement officials may arrest an individual in a public

place without a warrant if they have probable cause to believe that the individual committed a felony.  United States v. Clark, 647 Fed. Appx. 419, 421 (5th Cir. 2016), citing United States v. Garcia, 179 F.3d 265, 268 (5th Cir. 1999).  Probable cause exists when the facts available at the time of the arrest would support a reasonable person's belief that an offense has been, or is being, committed and that the individual arrested is the guilty party.  Clark, 647 Fed. Appx. at 421.

Agent King briefed Agent Witham on Defendant's criminal history.  Witham knew that Defendant was a felon at the time of the traffic stop.  Following the stop, Albrecht and Parker told Witham that they saw Defendant "moving around a lot."  Tr. 21.  Albrecht said that Defendant was making "multiple furtive movements toward the console area."  Tr. 82. To Albrecht, it appeared that Defendant "was trying to conceal something in between the driver and himself."  When the driver rolled down his window, Witham "pretty much instantly" saw the firearm next to Defendant in the passenger seat.  Tr. 23.

Defendant argues that the arrest was improper because the agents "were told to detain Shaw when he left the residence, although they had no probable cause to do so." However, the agents waited until they had probable cause to conduct the arrest.  They knew of Defendant's criminal history and saw him in the truck with a firearm in the console next to him.  At that point, the agents had probable cause to arrest Defendant for being a felon in possession of a firearm.

### F. Search of Defendant's Backpack

The Government argues that the search of the backpack was a valid search incident to arrest. Defendant argues that the search was not valid because Defendant was not under arrest at the time of the search and because the backpack was locked.

A seizure is an arrest "if a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." Turner v. Lt. Driver, 848 F.3d 678, 692-93 (5th Cir. 2017). When Witham searched the backpack, Defendant was on the ground and his hands were cuffed behind his back. Tr. 31. His freedom of movement was restrained. Therefore, Defendant was under arrest at the time the backpack was searched.

Once police make a lawful arrest, a full search of a person incident to the arrest requires no additional justification and constitutes a reasonable search under the Fourth Amendment. Clark, 647 Fed. Appx. at 423, citing United States v. Robinson, 94 S.Ct. 467 (1973). Police "may search the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." United States v. Johnson, 846 F.2d 279, 281 (5th Cir. 1988).

"The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." Robinson, 94 S.Ct. at 476. Thus, police officers are not constrained to search only for weapons or instruments of escape; they may also look for evidence of the arrestee's crime in order to

preserve it for use at trial. Robinson, supra (upholding search that found drugs in a closed cigarette package on arrestee's person).

The permissible scope of a search incident to a lawful arrest extends to containers found on the arrestee's person or in his immediate control. United States v. Johnson, 846 F.2d 279, 282 (5th Cir. 1988) (per curiam) (briefcase was within arrestee's immediate control; postal inspectors could open it and looking through contents as incident to arrest); see also New York v. Belton, 101 S.Ct. 2860, 2864 (1981) (police may search containers, whether open or closed, located within arrestee's reach). And the Government does not have to show that one or more of the justifications authorizing a search incident to arrest are present in a particular case. "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Robinson, 94 S.Ct. at 477. "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." Id.

Defendant points out that, because the backpack was locked, the chance of Defendant retrieving a gun from the backpack was so remote and unlikely as to make the search invalid. Defendant relies on United States v. Chadwick, 97 S.Ct. 2476 (1977). There, the Supreme Court held that a search of a locked footlocker was invalid. However, in that case, the footlocker was not searched until an hour and a half after the arrest, after it was separated from the arrestee and transported to another location. The Court held that

the search could not be viewed as incident to arrest because "the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody." Chadwick, 97 S.Ct. at 2485-86. Rather than focusing on the locked nature of the container, the Court "drew the line of when a warrant was needed to search property 'at the point where the property... comes under the exclusive dominion of police authority.'" Johnson, 846 F.2d at 282, quoting Chadwick, 97 S.Ct. at 2486. The Court "distinguished searches of possessions within the person's immediate control and searches of the person." Johnson, 846 F.2d at 282, quoting Chadwick, 97 S.Ct. at 2486 n. 10.

Here, the backpack was on Defendant's shoulder when he was handcuffed and was hanging down in reach of his hands. Tr. 31. Agent Witham used a knife to cut it off of Defendant's shoulder, and he was standing right next to Defendant when he cut a hole in the bag and discovered marijuana inside. Tr. 31. Given Defendant's criminal history and the discovery of the gun near Defendant in the truck, it was reasonable to believe the bag might also contain a weapon. Tr. 57; Tr. 82; Tr. 84. Witham was not unreasonable in believing it was possible for Defendant to get out of his handcuffs because he had seen suspects free themselves from handcuffs in the past. Tr. 35. The lock on the backpack was a combination lock. Defense Ex. D-2 (photos of exemplar backpack). Defendant presumably knew the code and would be able to open the lock even without a key.

Defendant argues that a search of a locked container should be treated as a search of a cell phone. The Supreme Court has refused to extend the search incident to arrest authority to searches of cell phones. Defendant argues this reasoning should apply to

locked containers.  But, unlike a cell phone, a backpack can contain a weapon and is, therefore, more dangerous to police.  The search incident to arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."  Arizona v. Gant, 129 S.Ct. 1710, 1716 (2009).  To require a search warrant of a container that the Defendant can access, even if the chance of access is a small one, would negate those interests.   Accordingly, the court finds that the search of the backpack was a valid search incident to a lawful arrest. [7]

### G. Defendant's Statements

In his initial Motion to Suppress, Defendant argued that statements he made to agents after arrest were not free and voluntary.   A statement or confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching either by direct coercion or subtle psychological persuasion.  U.S. v. Bell, 367 F.3d 452, 460-461 (5th Cir. 2004); U.S. v. Mullen, 178 F.3d 334, 341 (5th Cir. 1999).  The statement must be voluntarily, knowingly and intelligently made, and the individual confessing must be cognizant of the rights being abandoned and the consequences of doing so.  U.S. v. Santiago, 410 F.3d 193, 202 (5th Cir. 2005).  When a defendant challenges the voluntariness of his confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at trial.  U.S. v. Clay, 408 F.3d 214, 221 (5th Cir. 2005).

---

[7] See also United States v. Hill, 818 F.3d 289 (7th Cir. 2016) (search of a bag the defendant was holding at the time of his arrest was a lawful search incident to arrest).

Voluntariness is evaluated based on the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225 (1973); <u>U.S. v. Barlow</u>, 41 F.3d 935 (5th Cir. 1994). Factors include the age of the accused, his intelligence and education, advice regarding his constitutional rights, length of detention, repeated and prolonged nature of the questioning and whether physical punishment such as deprivation of food or sleep was imposed. <u>Id</u>. No case turns on the presence or absence of a single factor. <u>Id</u>.

The Government proved that Defendant's incriminating statements were given post-<u>Miranda</u> and were voluntarily, knowingly, and intelligently made. Defendant was read his <u>Miranda</u> rights twice: first following his arrest on the scene of the traffic stop, and a second time at the residence as King was executing the search warrant. Both times, Defendant acknowledged his rights. Defendant then spoke with King and admitted to owning the pistol and the drugs. Defendant was coherent during his encounter with the agents, and the evidence showed that he understood his rights. Defendant was not subjected to any type of abusive, threatening, or overreaching police questioning or tactics. Based on the totality of the circumstances, the court finds that Defendant voluntarily, knowingly, and intelligently made the incriminating statements to the agents.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 15) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this

report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of February, 2020.

Mark L. Hornsby
U.S. Magistrate Judge